# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff**


    **v.**                                 **Case No. 3:19cr58-MCR**

**RALPH WILLIAM CURTIS, III,**

    **Defendant.**

_____/


## <u>ORDER</u>

Defendant Ralph William Curtis, III, is charged with one count of possessing a firearm and ammunition as a convicted felon, 18 U.S.C. § 922(g), and one count of possessing an unregistered firearm, in violation of 26 U.S.C. § 5861(d). The Defendant has moved to suppress the firearm and ammunition on grounds that they were seized as part of an unconstitutional inventory search, ECF No. 19. The Court held an evidentiary hearing and took the motion under advisement. Now, having fully and carefully considered the matter, the Court denies the motion.

**Background**

At the hearing, the Government presented one witness: Deputy Alfred Calabro of the Santa Rosa County Sheriff's Office. He testified that on March 18, 2019, another deputy, Tony Alexander, notified him of a possible suspicious vehicle

in the parking lot at the Tom Thumb convenience store and gas station in Navarre, Florida. Alexander had observed the vehicle, a silver Mercury, being driven through the parking lot by a white male, later identified as Curtis, who parked the car in the back by a dumpster. Deputy Alexander was called away and Deputy Calabro arrived to continue the observation. He saw the suspect still in the driver's seat with a large dog in the back. Deputy Calabro saw Curtis exit the vehicle, and walk toward the store, where he remained, "kind of hanging around" the ice machine in front of other parked cars. Deputy Calabro was able to see that the numbers on the vehicle registration tag had been altered. Gov't Exs. 1, 2. He used his computer to check the status of the registration tag and learned that the tag was not valid and had not been registered at any time in the last couple of years. Deputy Calabro called for assistance, and Deputy Robert Hartzog arrived within three or four minutes.

Deputy Calabro then approached Curtis on the sidewalk in front of the Tom Thumb to ask for identification due to the altered vehicle registration tag. Curtis initially refused, became argumentative, and denied driving the car. Deputy Alexander returned and confirmed that it was Curtis he had seen driving the vehicle through the parking lot. A record check confirmed that Curtis's license was suspended and he had three prior convictions for driving with a suspended license. Curtis was then placed under arrest for driving with a suspended license, as a habitual

offender, which is a felony under Florida law, and he was cited for having a tag that was not assigned to the vehicle and no insurance. Curtis later admitted to the officers that he had driven the vehicle but insisted he had only moved it from a parking spot in front of the store to the spot in the back by the dumpster. Deputy Calabro confirmed by the store's video surveillance that the car had never been parked in front of the store. Curtis also said that his friend "Troy," who owned the vehicle, had been driving but had walked off. Deputy Calabro found no evidence of Troy. Curtis was worried about his dog because he had no one to take the dog if he were arrested. He also expressed concern for an expensive piece of drywall equipment/tool that was inside the car.

Deputy Calabro contacted dispatch to determine ownership of the vehicle and contacted Animal Control to take custody and care of the dog. Dispatch reported that the tag had last been registered in 2010 to someone on a different vehicle and that, based on the VIN, this vehicle had last been registered in 2016 to a woman in or near Pensacola, Florida. Deputy Calabro spoke with her by phone and learned she had sold the car and did not know Curtis. No owner or registration for the vehicle could be identified. Deputy Calabro then made the decision to have the vehicle inventoried and towed for safekeeping.

Case No. 3:19cr58-MCR

Santa Rosa County Sheriff's Office has a comprehensive standardized policy for towing and inventorying vehicles, Standard Operating Procedure 13.17. Govt's Ex. 6. Deputy Calabro testified that he relied on the policy as a whole in deciding to tow the vehicle and inventory its contents, considering a number of different factors, including that the vehicle had been used in the commission of a felony, a concern for the safekeeping of property that might be in the vehicle, and the fact that the vehicle could not be legally driven by anyone due to the altered registration tag and lack of registration or insurance. Deputy Calabro said he did not give Curtis an opportunity to make other arrangements for the vehicle because Curtis was not the owner and no one could operate the vehicle legally. He testified that for all of these reasons, "it's got to be towed for safekeeping."[1] He thus called a rotation wrecker for a "no-hold" tow, which, under the policy, required an inventory of the vehicle's contents.[2] Deputy Calabro denied that the inventory was a search incident to arrest or a search for evidence.[3] When questioned as to why he did not just leave the

---

[1] Section VII of the Standard Operating Procedure states, "[w]hen the operator of a vehicle is arrested and the vehicle is to be towed for safekeeping," a rotation wrecker will be called and a vehicle inventory receipt will be prepared. Govt's Ex. 6 (Section VII, A).

[2] Deputy Calabro did not impound the vehicle as evidence, as permitted under the standard procedures. Pursuant to Section VIII, a vehicle will be removed to the Sheriff's impound lot by a contract wrecker service if the vehicle was used in the crime *and* the vehicle is of evidentiary value or is subject to forfeiture. Govt's Ex. 6 (Section VIII, B).

[3] Sheriff's Office policy, General Order M-002, details arrest procedures. Def. Ex. 1. Curtis correctly points out that under Section XV, a warrantless arrest does not justify a search of

vehicle in the private parking lot, Deputy Calabro candidly acknowledged that the vehicle was lawfully and safely parked in the rear of the convenience store, which is private business property and not public property;[4] explained he was concerned about the safety of valuables inside the vehicle, as Curtis had referenced; and said he could not leave a vehicle used in a crime "abandoned," even on private property, which would have been the result here, given that the vehicle had no valid tag, no registration, and no identifiable owner.[5]

Deputy Hartzog assisted with the vehicle inventory, during which the officer found a backpack containing shotgun shells lying among brass knuckles and drug

---

the interior compartment of a vehicle or containers, unless the person arrested was within reaching distance of the compartment or the deputy articulates facts that provide a reason to believe the vehicle contained evidence of the offence for which the person was arrested. General Order M-002, Section XV, A, 1; *see also Arizona v. Gant*, 556 U.S. 332, 351 (2009) ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."). The Court credits Deputy Calabro's testimony that he was not conducting a search incident to arrest.

[4] Section I describes deputies' general authority for "Vehicle Removal." It authorizes deputies to remove a vehicle from *public property* when the person in control of the vehicle fails to do so himself and one of nine other circumstances is met, including that the operator is taken into custody and reasonable efforts are made to allow alternative arrangements. Govt's Ex. 6. (Section I, A, 9).

[5] Section V, which outlines procedures for the removal of abandoned vehicles, draws a distinction between a vehicle abandoned on private property and one abandoned on public property. Under this section, a vehicle abandoned on private property, "including shopping centers, will not be impounded" unless by court order or "the vehicle is stolen or has been used in the commission of a crime." Govt's Ex. 6 (Section V, A, 1). It also provides that a private property owner is responsible for the removal of an abandoned vehicle on the private property "*except* stolen vehicles or those used in the commission of a crime." *Id.* (Section V, A, 3) (emphasis added).

paraphernalia, and a sawed off shotgun under the carpet in the trunk.[6]  The firearm, ammunition, backpack and its contents were seized.  Other items, listed as "ipod, tool, blanket," were inventoried and remained in the car, which was towed to Bayside Towing.

**Discussion**

The Supreme Court has long held that an inventory search is "a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *see also United States v. Laing*, 708 F.2d 1568, 1570 (11th Cir. 1983) ("To conduct a routine inventory check, law enforcement officials need not obtain a warrant.").  This exception is justified by the need to protect public safety, which is part of law enforcement's "community caretaking functions;" the need to protect the owner's property; and the need to protect police from potential danger or claims of theft.  *See South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976).  Inventory searches are reasonable for Fourth Amendment purposes where the vehicle is lawfully impounded or otherwise lawfully in police custody, and "the process is aimed at securing or protecting the car and its contents."

---

[6] Deputy Calabro stated that because people often hide valuables in the spare tire compartment under the carpet in the trunk, it was reasonable to check there while conducting the inventory search.

*Id.* at 373. The use of "standardized criteria" or an "established routine" administrative practice designed to produce an inventory ensures that an inventory search was administered in good faith and not as a mere "ruse for a general rummaging in order to discovery incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990); *see also Bertine*, 479 U.S. 372-376.

Thus, to be upheld as a valid inventory search, "the police must first have the authority to impound the vehicle and must then follow the procedures outlined in the policy." *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991). "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Opperman*, 428 U.S. at 369. Impoundment is also authorized where the driver is arrested. *See Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992) ("Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, a law enforcement officer may impound the vehicle so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity."). Following standardized criteria ensures that an inventory search will not be "a surrogate for investigation" and confines the scope of an inventory search to that "necessary to accomplish the ends of the inventory." *United States v. Khoury*, 901 F.2d 948, 958 (11th Cir. 1990). As a constitutional

Case No. 3:19cr58-MCR

matter, there is no requirement to give a driver an opportunity to move a vehicle that is not presenting a hazard; law enforcement officers may exercise their discretion, provided that discretion is based on standard criteria and not suspected criminal activity. *See Sammons*, 967 F.2d at 1540-41 (rejecting an argument that impound on arrest was unconstitutional because the vehicle was parked safely and arrestee not allowed to make other arrangements; it is not necessary to show a need to impound). The question is "not whether a more reasonable path could have been traveled, but whether the actions [of the officer] were reasonable in light of the circumstances." *Id.* (internal marks omitted, citing *Bertine*, 479 U.S. at 374). Where "reasonable police regulations related to inventory procedures" are established by "standardized criteria" or "established routine" and "administered in good faith," the Fourth Amendment is satisfied. *Bertine*, 479 U.S. at 373-74; *Wells*, 495 U.S. at 4. Because an inventory search is an exception to the warrant requirement, it is the Government's burden to show that the search was lawful. *See Sammons,* 967 F.2d at 1543.

Curtis argues that the inventory was not authorized because it was not justified by a search incident to arrest, no exigent circumstances existed, and the vehicle was safely parked in a private lot, not on public property. More particularly, Curtis argues that the inventory was not authorized by standard criteria because Section I

Case No. 3:19cr58-MCR

authorizes towing and inventorying a vehicle when the operator is taken into custody *and* the vehicle is on public property. In response, the Government argues that the decision to tow and inventory the vehicle was made in good faith and consistent with the standard procedures. The Court agrees with the Government.[7]

The Standard Operating Procedures outline the generally applicable standardized criteria for inventorying and towing a vehicle, but it goes without saying that the standard procedures cannot detail every conceivable set of facts that a deputy may encounter. An officer must exercise reasonable discretion given the standard criteria and the circumstances presented. The Supreme Court has consistently held that, in reviewing the application of standard inventory procedures, courts should not insist on a "totally mechanical 'all or nothing'" application. *Wells*, 495 U.S. at 4. Reasonableness under the Fourth Amendment depends on good faith, and "[n]othing . . . prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Bertine*, 479 U.S. at 374-76 (also noting that reasonableness does not turn on whether there were less intrusive means, such as parking and locking a vehicle); *see also Sammons*, 967 F.2d at 1540-41 (nothing

---

[7] The Court agrees with Curtis, however, that there were no known exigent circumstances at the time and the search was not justified as a search incident to arrest.

prohibits the exercise of police discretion as long as it is exercised according to standard criteria and not on the basis of suspicion of criminal activity).

In this case, Deputy Calabro had two options, either have the vehicle towed or leave it abandoned in the Tom Thumb parking lot. Viewed in isolation, it appears that no single provision of the Standard Operating Procedures fit the situation neatly. Curtis was not the owner, and his arrest as a habitual offender for driving while his license was suspended shows that the vehicle was used in the commission of a crime. This precluded Curtis from taking possession of the car, no one else was present, and despite Deputy Calabro's efforts, no owner could be identified so no one could lawfully take possession of the vehicle or drive it. *See United States v. Moss*, 748 F. App'x 257, 260 (11th Cir. 2018) (stating, "Florida law prohibits operating a vehicle bearing a tag that is not registered to that vehicle, and thus it would not have been legal for *anyone* to drive the [vehicle]"). The vehicle therefore would have been abandoned in the Tom Thumb parking lot if Deputy Calabro left it.

The Standard Operating Procedures required impoundment of a vehicle used in a crime, but only if the vehicle was of evidentiary value (Section VIII.B), and Deputy Calabro did not find it necessary to impound the vehicle as evidence for this crime. At the same time, however, Deputy Calabro was aware that there was valuable property inside the vehicle that needed to be safeguarded. As Curtis notes,

Case No. 3:19cr58-MCR

Section I of the Standard Operating Procedures allowed towing for safekeeping when the operator was arrested *and* the vehicle was on public property (Section I.9), which this one was not.  On the other hand, the provision detailing the procedures to be followed when a vehicle is towed for safekeeping after arrest does not expressly limit itself to a vehicle on public property (Section VII).

Nothing in the Standard Operating Procedures specifically addresses towing for safekeeping after arrest where the vehicle was used in a crime but not impounded for evidence, and if left, clearly would be *abandoned* on private business property. Notably, the Standard Operating Procedures recognize that a private property owner should not be responsible for removing an abandoned vehicle that has been used in the commission of a crime.  *See* Section V, A, 3 (stating private property owners are responsible for the removal of abandoned vehicles on their property "*except* stolen vehicles or those used in the commission of a crime" (emphasis added)).  Moreover, no Fourth Amendment principle required Deputy Calabro to leave the ownerless vehicle in the private business parking lot, even though it was safely parked. *See Sammons*, 967 F.2d at 1540-41; *see also United States v. Roberson*, 897 F.2d 1092, 1096 (11th Cir. 1990) (finding it was not unreasonable to impound and inventory a vehicle, even though it was parked in a parking lot of a private corporation, where the driver was arrested and no one was present to take custody of the vehicle).

Case No. 3:19cr58-MCR

The Court finds that Deputy Calabro's decision to have the vehicle towed for safekeeping was made in good faith and demonstrated a reasonable exercise of discretion given the circumstances, consistent with the standard criteria. To find otherwise would be to insist on a mechanical application of one isolated provision of the standard policy (regarding vehicles on public property) without regard to others or the circumstances presented. Finally, Deputy Calabro's testimony was credible, and nothing suggests that he chose to have the vehicle towed in order to investigate criminal activity. *See Wells*, 495 U.S. at 4 (governing policy must be designed to produce an inventory, not a rummaging for incriminating evidence); *see United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (credibility determinations are typically the province of the fact finder). The Court finds that the Government has met its burden to establish a valid and reasonable inventory search under the Fourth Amendment.

Accordingly, Defendant's Motion to Suppress, ECF No. 19, is **DENIED**.

**DONE AND ORDERED** this 25th day of September 2019.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**


Case No. 3:19cr58-MCR